LENA CAUSEY, Appellant, v. JOHN WITTIG.—11 S. W. (2d) 11.

Court en Banc, November 24, 1928.

*Strubinger & Foster* and *Percy Werner* for appellant.

*Brackman, Hausner & Versen* for respondent.

HENWOOD, C.—Lena Causey sued John Wittig, in the Circuit Court of the City of St. Louis, for damages in the sum of $10,000, alleging that the death of her husband, Charles Causey, resulted from injuries received in a collision with defendant's automobile, while the same was being driven by defendant in a negligent manner. The jury returned a verdict for defendant, and from the judgment rendered accordingly, plaintiff has perfected this appeal.

The petition contains seven different specifications of negligence, but the plaintiff's case was submitted to the jury on the humanitarian doctrine only. The answer is a general denial, coupled with a special plea that the collision was caused by the negligence of deceased in failing to look and to listen for vehicles traveling along Tower Grove Avenue before attempting to cross said avenue from the west to the east side thereof. The reply is a general denial of the affirmative allegations of the answer.

At the time in question, Charles Causey was forty-eight years of age, and lived at Valley Park, a suburb of St. Louis on the west. He was employed as a receiving clerk by the General Motors Company in the north section of St. Louis and, in going to and from his work, usually rode a Frisco train between Valley Park and Tower Grove. and a street car between Tower Grove and his place of employment. On the evening of October 22, 1923, about 6:30 or 6:45, he got off of a street car on Tower Grove Avenue in the vicinity of the Tower Grove station of the Frisco railroad and, while crossing from the west side to the east side of Tower Grove Avenue, collided with defendant's automobile. He suffered a severe fracture of his skull in the mastoid region, which resulted in his death five days later. At this point, Tower Grove Avenue was about sixty feet wide, and in the middle portion thereof were double street-car tracks, known as the southbound and northbound tracks. Defendant was driving his Cole Eight Sedan, 1917 Model, north on Tower Grove Avenue, from fifteen to forty feet north of Folsom Avenue, and "astraddle" or near the east rail of the northbound street-car tracks.

when the collision occurred. When picked up, Causey was lying on his back across the east rail of the northbound tracks, with his feet extending toward the east. His face and hands were not bruised or wounded, and no injury was referred to by the witnesses at the trial, except the facture of his skull. It was dark and the street lights and lights on the street cars were turned on. There was an up-grade toward the south on Tower Grove Avenue at the point of the collision, variously estimated by the witnesses at 3½ to 50 per cent. The photograph of the street (plaintiff's Ex. A) would indicate that the assistant city engineer's estimate of 3½ per cent was approximately correct. As to how the collision occurred, there was a sharp conflict in the evidence.

Lowell Sewell, nineteen years of age, testified, for the plaintiff, as follows: "I was on the east side of Tower Grove Avenue, walking south. I noticed *this man was out in the center of the two tracks and Mr. Wittig was about twenty or twenty-five feet south and this man taken two or three steps on and Mr. Wittig hit him.* Mr. Wittig was twenty or twenty-five feet south of the man when I first saw the man. At that time the man was out in the middle of the street in the middle of the two tracks, and the automobile which struck him was coming north. Before the accident I didn't hear any horn sounded. The weather was dry. At the point where the accident happened, Tower Grove is up-grade, going north. The accident happened about fifteen or twenty feet on this side, north of Folsom and Tower Grove. When the man was struck by the automobile he fell face downward. It looked to me like the automobile struck him *about the left front fender. It was the front end of the car.* In my best judgment this automobile, when I first saw it, was going *about twenty or twenty-two miles an hour.* The automobile didn't slacken its speed before it struck this man, that I noticed. I didn't notice any slackening of the speed." On cross-examination, he said: "When the man was hit I didn't notice which way he fell. *I think the left front fender hit him. It looked to me like that.* I testified in the former trial that I saw the man hit by the *front end* of the car. I testified he was hit *about at the front radiator—about at the crank.* It looked to me it was the *left fender in front.* He was hit in the *front somewhere*—I couldn't say where it was—it might have been near the crank or the fender, I don't know. *I won't say whether it was the crank or the fender.* I couldn't say for sure where Wittig's automobile was when it struck Causey, with reference to the street car tracks, but I think it was near the east rail, astraddle, or pretty close." Sewell was the only witness for the plaintiff, who said he saw Causey and the automobile at the time and immediately before the collision.

One of Sewell's companions, Crawford Wright seventeen years of age, testified that Sewell said, "Look," but when he first saw the automobile it was "fifteen or twenty feet past the man" and going "about ten or fifteen miles an hour;" and that the automobile "finally came to a stop about fifty or sixty feet north of the man."

Everett Joseph Reece, testifying for plaintiff, as to appearances after the accident, among other things, said: "When I got there the defendant's automobile was about fifty feet north of the man, and right back of the man was a northbound street car that had stopped, and just to the west of the man was a southbound street car. It was stopped. On cross-examination, he estimated Causey's height at "about five feet seven or eight inches."

Earl H. Sparr, superintendent of Mendenhall Motor Company and an experienced automobile driver, testified that, at the request of plaintiff's counsel, he made stop tests with a Cole Eight automobile running north on Tower Grove Avenue at or near the point in question, when the street was dry, and that a safe stop could be made at twenty to twenty-two miles per hour within thirteen feet and ten inches; at fifteen miles per hour within eleven feet; and at ten miles per hour within six feet.

On behalf of the defendant, Warren Olsen, fifteen years old, testified: "The street car was coming down from the north—it made a turn into Tower Grove and was going south on Tower Grove over the viaduct—that was the southbound car track. Mr. Causey came from the west, I saw him *run* in front of this street car. The street car was lighted—the front lights lit. The automobile was just about up to Folsom. The night of this accident this man *ran* about ten feet in front of a street car and *then into the fender* of Mr. Wittig's machine—*that was the left rear fender*. I was standing north of Mr. Wittig's automobile. Mr. Causey fell into the street. Mr. Wittig stopped his car about ten feet, as near as I can remember—it has been so long ago—about ten feet farther on. In my judgment the speed of Mr. Wittig's car when I saw it was ten miles an hour. The left wheel of this car was over the northbound track. He pulled out and put the two left wheels on the other side of the northbound car track. Mr. Causey, when I saw him crossing the street, was going *southeast—kind of running."* On cross-examination, he said: "I can't remember having heard a horn. I have forgotten a whole lot about the accident—it has been so long ago. *I saw the man run into the left rear fender and his head struck the fender. I saw his head strike the left rear fender.* Kind of near the top of the fender—not right on top. It was about one and one-half or two feet, as well as I can remember, above the running board. *I saw his head hit that. He was running right towards the car. He was bent over.* I don't remember how tall a man he was. He was taller than I. *He was*

*bent over like this* (indicating.) That would be about four feet off of the ground, his head would be, and *he was running and struck his head right on the left rear fender.* When I first saw this automobile I don't know whether he slackened its speed. *I could plainly see this man stick his head into the rear fender.* I was on the east side of the street; the automobile ran between me and the man. The street car kept on going. *I saw this man's head hit the fender, the left rear fender.*"

Claude Newberry, fifteen years old, who was with Olsen at the time of the accident, testified: "I saw a man running from the west side of the street in front of a street car *with his head down.* The street car was a little past the entrance to the station, going south. He was going from the west side of the viaduct, *running southeast.* The car wasn't straight in front of him. The headlights on the street car were burning as bright as any other car light. He *ran across* from the west side in front of the street car. Mr. Wittig's machine going north, and the left wheel was a little over the westbound track—the east rail—and *he ran into the left rear fender* of Mr. Wittig's machine. Mr. Wittig's machine was a little in front of me—little north of me. He hit his head on *the left rear fender and dropped.* Mr. Wittig was traveling ten or eleven miles an hour when I saw him. I said the man stuck his head in *the left rear fender; I saw that.* I don't know *who put the dent in,* but I saw him run his head into *the left rear fender.* I saw the man run in front of the street car—*he was stooping over—had his head down, running southeast.* I didn't notice the automobile slacken its speed—didn't see it swerve in—didn't pay any attention to any horn. This man was *running very fast.* I didn't see the injured man *look in the direction of the automobile.* He didn't see the automobile that I know of."

Both Olsen and Newberry testified at the coroner's inquest.

Charles E. Frank, a police officer, made his investigation of the accident after the defendant had taken Causey to a doctor's office near the scene of the accident. The two boys, Olsen and Newberry, reported to him that they saw the accident. He further testified: "I saw the *left hind fender dented inward—the left hind fender. It was bent.* I didn't see any other marks on the car. The dent I saw was a foot and a half above the running board. The running board is about a foot from the ground, so my best judgment is that this dent was two and a half feet above the ground. It *was dented in towards the body of the car, looked like something had run into it from the side—broadside.* It was on the top of the fender dented in towards the body. The dent was six inches wide."

The defendant testified that he was a barber and owned a barber shop at 919 South Vandeventer. Concerning the accident, he said:

"I was going north between half past six and a quarter to seven. It was dark—my lights were burning. I was driving along at a medium rate of speed, and there was a machine ahead of me and some back of me, and after I passed Folsom, I suppose around about twenty-five or forty feet, *something struck the side of my machine,* and I had the window open on the car, and my arm that way, and I looked, and as I looked there was a man on the ground, and I stopped about—well, as close as I can remember, about fifteen feet from where this man was, and I got out of my machine, and I was the first man to pick him up, and I was holding him in my arms, just kind of sitting up, and he was unconscious. As I drove my car along I was between the northbound track and the curbing. I didn't see this man at any time before he hit my car. He came in contact with the left side. He ran into it—the side of the car hit him. I didn't see him when he ran into it. *The bump in my car was back of where I sat.* I was driving at a moderate rate—not very fast, because I intended to make the turn there—there was lots of traffic. I intended to make the turn in Vandeventer off of Tower Grove. I was about sixty feet from that turn when the accident happened. As I was driving along, I looked in front of my car. I first saw the *dent in the car fender* after the accident when the policeman examined the machine. I don't know how the dent got there." On cross-examination, he further said: "I couldn't tell how fast I was driving—it was around nine or ten or eleven miles—at that point going nine or ten miles. With my car I guess I could have stopped a little quicker if I had known it was going to happen. The man was not a very tall man nor a very heavy man. Cannot tell you how tall he was—about five feet five inches."

In rebuttal, the plaintiff testified that her husband "was five feet ten inches tall."

I. Respondent's motion to dismiss this appeal was, by order of this court, taken as. submitted with the case. The only ground assigned for dismissing the appeal is that the affidavit for appeal was not signed. True, the affidavit does not show the signature of the affiant, Joseph T. Strubinger, one of plaintiff's attorneys, but the *jurat* signed by the Clerk of the Circuit Court of the City of St. Louis, with the seal of that court attached, recites that the affidavit was "subscribed and sworn to" before the clerk on May 8, 1925. And the record recites that the affidavit for appeal was filed and that plaintiff was granted an appeal to this court on May 8, 1925. Notice of this motion was not given until January 6, 1928, although the case was set for argument and was argued and submitted on January 13, 1928. On the same day that notice of the motion was given, January

6, 1928, appellant was served with a copy of respondent's brief on the merits of the case. This, of course, was after appellant had perfected her appeal by filing her abstract of the record and brief in this court. Thus, it appears that respondent treated the affidavit for appeal as sufficient until one week before this appeal was set for argument on its merits and was not in any way prejudiced by the irregularity complained of. In this situation of the record and of the parties, both common sense and common fairness demand a ruling against respondent on this complaint. "No point was made against the sufficiency of the affidavit in the court from which the appeal was taken, and where, in all fairness to the trial court and the appellant, the objection to the affidavit should have been made; otherwise, an appellee or his attorney might remain silent, knowing that an invalid affidavit for the appeal was being or had been filed, and afterwards take advantage of his adversary by raising an objection to it for the first time in the Court of Appeals, knowing that, under the rulings of that court, it could not be amended." [State ex rel. v. Broaddus, 210 Mo. 16, 108 S. W. 544.] See also, Davidson v. Land Co., 253 Mo. 223, 228, 161 S. W. 686; Clark v. Railroad, 242 Mo. 570, 593, 148 S. W. 472; Egger v. Egger, 225 Mo. 116, 136, 123 S. W. 928; Darrier v. Darrier, 58 Mo. 222, 234. The motion to dismiss the appeal is overruled.

II. The sole question presented for our review on the merits of this appeal is the alleged error of the trial court in giving defendant's modified Instruction 5, which reads as follows.

"The court instructs the jury that if you find and believe from the evidence that while defendant was operating his automobile north on Tower Grove Avenue, the deceased, Charles Causey, *suddenly ran across the street in front of a moving street car and toward the left rear side of defendant's automobile and in so close proximity thereto as to make it impossible for the defendant to prevent his automobile from colliding with the said deceased by the exercise of the highest degree of care in the operation thereof,* then your verdict must be in favor of the defendant." (Italics ours.)

On the face of this instruction, it is not clear whether it was intended to predicate a verdict for the defendant on the negligence of deceased as *a contributing cause* of the collision or as *the sole cause* of the collision. The statements of counsel for both sides, both in their briefs and in their oral argument before this court, that the answer contained a plea of contributory negligence, would indicate that, by this instruction, it was intended to tell the jury that the *contributory negligence* of deceased would defeat plaintiff's recovery. On the other hand, the statement of counsel for defendant, in their

written argument, that the instruction "submitted to the jury the theory of the case as shown by defendant's evidence," would indicate that it was intended to tell the jury that the plaintiff was not entitled to recover if the collision was caused *solely* by the negligence of deceased. While there is no appellate issue on the pleadings, it may be well to note here that the answer, as indicated in our preliminary reference thereto, does not, in fact, contain a plea of contributory negligence. The part of the answer so designated by both parties and, apparently, so treated by them at the trial, is a special plea "that the injuries, if any, to plaintiff's husband were caused by *his own negligence and carelessness*," (in substance), in failing to look and to listen for vehicles traveling along Tower Grove Avenue before attempting to cross said avenue from the west to the east side thereof. (Italics ours.) The special plea does not say that such negligence on the part of deceased was a contributing cause of the collision and his resulting injuries and death, but merely says that, by looking and listening, he could have avoided the collision. So much for the confusion. We will now consider the instruction from both viewpoints. If it submitted the issue of contributory negligence, it was clearly erroneous, because that issue was not involved after plaintiff submitted her case on the humanitarian doctrine only, and because, of course, the contributory negligence of deceased did not relieve the defendant of liability under that doctrine. If it submitted the issue of deceased's negligence as the sole cause of the collision, it was erroneous, because it did not require the jury to find that the negligent acts of deceased, mentioned in the instruction, were the *sole cause* of the collision and his resulting injuries and death. In failing to require the jury to so find, the instruction ignored the issue of concurrent negligence or the question of whether or not the collision was caused by the concurring negligence of defendant and deceased. In other words, it did not require the jury to find whether or not the defendant saw or, by exercising the highest degree of care, could have seen the perilous situation of deceased, while crossing the street, in time, by exercising the highest degree of care, to have prevented the collision, by stopping his automobile, or by reducing the speed thereof and warning the deceased of its approach, or by turning his automobile aside. Plaintiff's main instruction (No. 1) properly predicated her recovery on an affirmative finding as to one or more of these omissions or acts of negligence on the part of defendant, and it follows, therefore, that defendant could not escape liability without a negative finding as to all of such omissions or acts of negligence on his part. In any view that may be taken of this instruction, it must be conceded that it did not make it clear to the jury whether the defendant was required to do anything to prevent the collision until the deceased was in "close proximity" to his

automobile. So, to say the least, the instruction was confusing and misleading in this particular. And, in its present form, it is subject to the further criticism that it singled out and gave undue prominence to certain facts favorable to defendant and omitted certain other material facts which were in dispute. Viewed in this light, it furnished the jury with an argument on defendant's side of the case rather than enlightenment as to the rule of law applicable to the issues of fact. It was, for these reasons, highly prejudicial to the plaintiff, and, therefore, must be held to be reversible error. Without prolonging this discussion further, by quoting from controlling authorities, it should suffice to say that this court and our courts of appeal have uniformly condemned instructions of this character. [Schulz v. Smercina, 1 S. W. (2d) (Mo. Sup.) 113, 119, 120; Hornbuckle v. McCarty, 295 Mo. 162, 171, 243 S. W. 327; Stewart v. Ry. Co., 188 S. W. (Mo. Sup.) 198, 199, 200; Turnbow v. Dunham, 272 Mo. 53, 63, 197 S. W. 103; Nab₃ v. Schnellman, 254 S. W. (Mo. App.) 731, 734; Saulan v. Ry. Co., 199 S. W. (Mo. App.) 714, 715.] See also, Aaron Co. v. Hirschfeld, 89 Ill. App. 205; Mitchell-Tranter Co. v. Ehmett, 65 S. W. (Ky.) 835.

For the error of the trial court in giving this instruction, the judgment is reversed and the cause remanded for another trial.

PER CURIAM:—This cause coming into Court en Banc from Division Two, the foregoing divisional opinion of HENWOOD, C., is adopted as the decision of the court. *White, C. J.,* and *Ragland, Gantt* and *Walker, JJ.,* concur; *Blair, Atwood* and *Gentry, JJ.,* dissent in a separate opinion by *Blair, J.*

BLAIR, J., (dissenting).—I am unable to concur in Part II of the divisional opinion. The judgment is reversed on the ground that Instruction 5 was a comment on the evidence and authorized a verdict for defendant without requiring the jury to find that defendant was not negligent in the operation of his automobile after he saw or could have seen deceased in a position of peril. In my opinion, that instruction is not properly subject to either criticism.

In requiring the jury to find that deceased "suddenly ran across the street in front of a moving street car, and toward the left rear side of defendant's automobile, and in so close proximity thereto as to make it impossible for the defendant to prevent his automobile from colliding with the said deceased, by the exercise of the highest degree of care in the operation thereof," the court required the jury to find that defendant was not negligent *in any way whatsoever,* before it could return a verdict for defendant. The instruction required the jury to find that it was *impossible* for the defendant to

prevent the accident "by the exercise of the highest degree of care." That certainly meant care in every respect and included care after deceased came into a position of peril, as well as before that.

Defendant had the right to have the jury instructed upon the theory of the accident which his own testimony and that of his witnesses tended to prove. The theory was that the deceased suddenly ran around in front of a street car with head down and in effect butted into defendant's automobile at the left rear fender. If the jury so found the facts and found that it was impossible for defendant to prevent the accident by the exercise of the highest degree of care, it necessarily must have found that deceased at no time was in front of defendant's automobile and was not approaching it from the side in such manner that deceased could or should have seen him and anticipated the collision. The words "impossible to prevent" laid upon defendant a greater burden of responsibility to prevent injuring deceased than the law laid upon him. The law only required defendant to exercise the highest degree of care to avoid injuring the deceased. Under the law he was not required to show that it was *impossible* for him to prevent the accident.

Instruction 1, given at plaintiff's request, submitted the case to the jury solely on the humanitarian doctrine. After telling the jury what facts must be found by it to authorize a verdict for plaintiff that instruction concluded as follows:

"Your verdict must be in favor of the plaintiff and against the defendant, even though you may find from the evidence that said Charles Causey was guilty of negligence in failing to look or listen for vehicles before attempting to cross said Tower Grove Avenue."

The jury was thereby plainly told that contributory negligence on the part of deceased was no defense, if the jury found the other facts outlined in said Instruction 1. Instruction 5 was not in conflict with Instruction 1. At most Instruction 5 amounted to non-direction and not misdirection.

The criticism that Instruction 5 was a comment on the evidence appears in the majority opinion largely as a makeweight. I do not agree that it is justly subject to that criticism. How could the ultimate facts constituting the defendant's defense have been more concretely submitted to the jury than they were in that instruction? Such facts were testified to by defendant and his witnesses and, if true, completely exculpated defendant from the slightest responsibility for the death of the deceased. Defendant was entitled to have those facts submitted to the jury and to have the court tell the jury that, if it so found the facts, it should return a verdict for the defendant.

A careful reading of the record in this case leaves in my mind the firm conviction that the verdict was for the right party and should

not be disturbed, unless we are convinced that error was committed against the plaintiff which was actually prejudicial and influenced the verdict returned. The weight of the testimony was clearly in defendant's favor, although the duty rested upon plaintiff to establish defendant's negligence by the preponderance of the testimony. Only four persons testified to the position and movements of deceased and defendant just preceding and immediately attending the fatal accident. Lowell Sewell placed deceased as standing in the street about twenty feet in front of defendant's approaching automobile, so that the jury could have found from his testimony that defendant could have seen him in time to have avoided striking him. He also testified that he heard no horn. This is the testimony which authorized the submission of the case to the jury. At a former trial, this witness testified that deceased's head struck the automobile on the radiator about "at the crank." At the last trial, he testified that deceased was struck by the left front fender of defendant's automobile. The testimony of defendant's two apparently disinterested witnesses was in substance that deceased suddenly ran across the street in front of a moving street car and, with head down, ran directly into the left rear fender of defendant's automobile. The testimony of defendant and both his witnesses also tends to show that defendant did not see the deceased before the accident and could not reasonably have been expected to see him before he struck the automobile. With appropriate deference to the weight of the evidence, the jury very properly accepted the theory of the defense and unanimously returned a verdict to that effect. No sufficient reason for disturbing that verdict appears, and I respectfully dissent from the contrary conclusion reached in the majority opinion. *Atwood* and *Gentry, JJ.,* concur herein.